**SIGNED THIS: March 31, 2016**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.  14-70578 |
| BENITA K. ALEWELT, | ) | |
| | ) | Chapter 13 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| WESLEY P. HARDIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 14-07065 |
| | ) | |
| BENITA K. ALEWELT, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court is the Complaint to Determine Dischargeability of Debt brought by Wesley P. Hardin against Benita K. Alewelt ("Debtor"). Mr. Hardin claims that a maintenance reimbursement obligation owed to him by the Debtor should be excepted from any discharge issued to the Debtor in this case. Because Mr. Hardin has met his burden of proof that the debt was incurred by actual fraud, judgment will be entered in his favor.

## I. Factual and Procedural Background

The Debtor and Mr. Hardin were previously married to each other and were divorced in January 2010 pursuant to a Judgment for Dissolution of Marriage entered in the Circuit Court for the Seventh Judicial Circuit, Sangamon County, Illinois. Pursuant to the Judgment, Mr. Hardin was ordered to pay $700 per week in maintenance to the Debtor, terminating "upon the occurrence of any of the events set forth in 750 ILCS 5/510(c)." Mr. Hardin was also awarded exclusive custody of the parties' minor child. The state court subsequently reduced Mr. Hardin's maintenance obligation to $500 per week plus a percentage of overtime income. The court later ordered the Debtor to pay $68 per week in child support to Mr. Hardin, which he was allowed to credit against the maintenance payments. The maintenance payments were made by wage garnishment through Mr. Hardin's employer and could not be terminated or suspended without a court order.

On October 20, 2011, Mr. Hardin filed a petition in the state court to terminate his maintenance obligation, asserting that the Debtor was cohabiting with her then-boyfriend, Bradley Fanale, on a continuing conjugal basis.

Cohabitation was one of the events or factors referenced in the parties' Judgment for Dissolution that would result in the termination of maintenance. The Debtor denied that she was cohabitating with Mr. Fanale and claimed that she was entitled to continue to receive her maintenance payments. A multi-day trial was commenced in May 2012 in the state court. On March 19, 2013, the state court issued a memorandum opinion, finding that the Debtor and Mr. Fanale had been cohabiting in a "*de facto* husband-and-wife-like relationship since June 1, 2011," and retroactively terminating Mr. Hardin's maintenance obligation to that date.

In making the decision, the state court considered the testimony of numerous witnesses, including neighbors, friends, and family members, who saw the Debtor and Mr. Fanale together. The Debtor's brother and sister-in-law testified that the Debtor lived with them from the summer of 2010 until June 2011. The Debtor testified that after moving out of her brother's home in June 2011, she lived with various friends and then began renting an apartment in September 2011. But the Debtor produced no credible evidence of any of these living arrangements. Likewise, the Debtor tried to justify the numerous observations of her heading toward or coming from Lincoln, Illinois, where Mr. Fanale lived, by saying she was on her way to or from Williamsville, Illinois, to pick up her mail from a post office box. But again she produced no evidence that she was using a Williamsville post office box at the time. The Debtor testified at the hearing that she was then living in Taylorville, Illinois, but also produced no evidence to support that claim. The state court noted that the Debtor continued to use her brother's address on a variety of documents long after she admitted

moving from that residence. Overall, the state court found that the Debtor and Mr. Fanale were not credible witnesses.

In the March 2013 decision, the state court calculated that Mr. Hardin was owed $28,581.15 in maintenance reimbursements plus $6384 in unpaid child support through July 7, 2012. But because the maintenance payments had continued to be deducted from Mr. Hardin's pay until the decision was rendered, on March 4, 2014, the state court entered a final order, increasing the maintenance reimbursement obligation to $42,953.86 and the past-due child support obligation to $12,624, for a total of $55,577.86.

The Debtor filed her voluntary Chapter 13 petition on March 31, 2014. She listed the entire debt owed to Mr. Hardin on her Schedule F - Creditors Holding Unsecured Nonpriority Claims. On her bankruptcy petition, she listed her address as 402 N. Kickapoo Street, Lincoln, Illinois ("Kickapoo Address"). On her Statement of Financial Affairs, she indicated that she had lived at two other addresses in the preceding three years. She stated that she lived at 1717 N. Dirksen Parkway in Springfield, Illinois ("Dirksen Address") from September 2011 until April 2012. She also claimed to have lived at 5401 Oakcrest Road in Springfield, Illinois ("Oakcrest Address") in 2012 and 2013.

Mr. Hardin filed a proof of claim, asserting that the entire debt owed to him by the Debtor for child support and for maintenance reimbursement was entitled to priority status. The Debtor's plan proposed to pay the entire debt as a general unsecured claim, and the Debtor objected to Mr. Hardin's claim arguing that it should not be allowed as a priority claim. After an evidentiary hearing, the Debtor

conceded that the portion of the claim based on the judgment for past-due child support was, in fact, a priority claim. This Court found that the maintenance reimbursement portion of Mr. Hardin's claim was not a "domestic support obligation" entitled to priority status. *See In re Alewelt*, 520 B.R. 704, 712 (Bankr. C.D. Ill. 2014).

Subsequently, an evidentiary hearing on confirmation of the Debtor's Second Amended Chapter 13 Plan was held. Mr. Hardin had objected to confirmation of the plan, alleging that the Debtor had not filed her bankruptcy petition or plan in good faith and that she had not committed all of her projected disposable income to the repayment of debt. The Court denied confirmation of the plan because the Debtor's forms B22C-1 and B22C-2 contained inaccurate and out-of-date information that was unsupported by the Debtor's testimony, which was also not entirely credible. Among other problems, the forms falsely claimed that when the case was filed, the Debtor lived in a one-person household, notwithstanding the fact that she was admittedly living with Mr. Fanale. The Debtor amended her B22C-1 and B22C-2 and filed a Third Amended Chapter 13 Plan, which was confirmed without objection on June 23, 2015. The Third Amended Plan provides for priority treatment of the child support portion of Mr. Hardin's claim but the balance will be paid as a general unsecured claim.

Mr. Hardin timely filed his Complaint to Determine Dischargeability of Debt. In his complaint, Mr. Hardin argues that the unpaid child support debt is nondischargeable as a domestic support obligation. He also argues that, because the Debtor "engaged in a course of conduct to receive maintenance payments from

[Mr. Hardin] under false pretenses[,]" the maintenance reimbursement is nondischargeable under §523(a)(2)(A) of the Bankruptcy Code. The Debtor does not dispute the nondischargeability of her child support obligation but denies that the maintenance reimbursement should be excepted from her discharge.

A trial on the adversary complaint was held on January 20, 2016. At the commencement of the trial, the Debtor's attorney acknowledged that the state court decision—fixing June 1, 2011, as the date that the cohabitation began—was binding on the parties and this Court. On the motion of Mr. Hardin's attorney and without objection by the Debtor, the Court took judicial notice of the state court decision of March 19, 2013.

The Debtor testified that she had lived with her brother and sister-in-law, Dan and Jenny Alewelt, at the Oakcrest Address since November 2009, but that she moved out in June of 2011, and did not live there at all in 2012. She initially testified that she first moved in with Mr. Fanale in "the early part of 2013." She later testified that she moved in with him in September 2012. Further, she acknowledged that she testified during the state court proceedings in May 2012 that she did not live with Mr. Fanale at that time. At one point during trial, when asked whether she ever moved in with Mr. Fanale, the Debtor answered "no," before acknowledging that she did, eventually, do so. She married Mr. Fanale in November 2014 and acknowledges living with him since then.

Starting shortly after leaving the Oakcrest Address, the Debtor used that address on a variety of legal and financial documents. On September 6, 2011, she applied for a home loan and listed the Oakcrest Address as her "Current Street

Address." (Pl.'s Ex. 21.) In October 2011, she used the Oakcrest Address on documentation for the purchase of a new truck and used that address when registering the truck. (Pl.'s Exs. 8, 10.) On May 4, 2012, she submitted an amended financial affidavit to the divorce court, indicating that she kept her truck and other property at the Oakcrest Address. (Pl.'s Ex. 7.) She also used the Oakcrest Address on her tax returns for 2011 and 2012. (Pl.'s Exs. 13, 14.)

She testified that all of her mail, including bank statements from Marine Bank, were sent to the Oakcrest Address until at least March 2012, although the exhibits suggest that it was until at least April 5, 2012. (Pl.'s Ex. 17.) Some time thereafter, she got a post office box in Williamsville, Illinois, where she received bank statements and other mail until around March 2013. (Pl.'s Exs. 18, 19.) The Debtor testified that she did not recall when she started having mail sent to the Kickapoo Address, but acknowledged that the first Marine Bank statement containing that address is dated May 3, 2013. (Pl.'s Ex. 20.)

The Debtor offered a variety of explanations for her inconsistent use of addresses. She testified that she was afraid that Mr. Hardin would physically abuse her. She testified that he drove by when she was living at the Oakcrest Address and also visited her at her place of employment. But she also testified that he never harassed or abused her after the divorce petition was filed. According to her testimony, she left the Oakcrest Address in June 2011 and began staying with friends until she started living at the Dirksen Address under a six-month lease in September 2011, and for an additional month outside the lease. She stated that she made the rent payments in cash and acknowledged that her

bank records do not reflect any such payments. She also stated that she arranged with the landlord to park her truck in the rear of the apartment building, rather than in the parking lot in front, because she didn't want Mr. Hardin to know where she was living. The Debtor testified that she left the Dirksen Address the day after a state court hearing because she was concerned that Mr. Hardin had found out where she was living; she initially placed the date of the hearing in late 2012, then April or May 2012. With respect to her use of the Oakcrest Address on the auto loan application, the Debtor testified that she used the address because the lender wanted her most recent permanent address. Finally, she testified that she used the Oakcrest Address on her financial affidavit and tax returns with the approval of her divorce attorney and accountant.

Mr. Hardin testified about how he came to believe that the Debtor was cohabiting with Mr. Fanale. In 2011 and 2012, Mr. Hardin was a resident of Riverton, Illinois. Once the Debtor was no longer living at the Oakcrest Address, Mr. Hardin began seeing her truck parked at a house on Adams Street in Riverton, Illinois ("Adams Address"), approximately three or four nights per week and at times during the day. He later learned that the house belonged to Mr. Fanale. Mr. Hardin also saw the Debtor going into the garage at the Adams Address. After he filed his petition to terminate maintenance, Mr. Hardin noticed that the windows and garage door had been boarded up at the Adams Address, and the Debtor's truck was visible less frequently.

Around December 2011, Mr. Hardin stopped seeing the Debtor's vehicle at the Adams Address. In 2012, as part of his commute to Peoria, Illinois, for work,

Mr. Hardin regularly saw the Debtor's truck on the highway headed southbound towards Springfield where she worked. Mr. Hardin also testified that he had his truck serviced at a facility on Kickapoo Street in Lincoln, Illinois, and, in the process of doing so, saw the Debtor's truck parked at the Kickapoo Address. Finally, Mr. Hardin testified that, despite driving by the Dirksen Address daily, he never saw the Debtor's truck parked there.

Mr. Hardin's wife, Caprice Hardin, also testified. She began dating Mr. Hardin in 2010. She worked as a pet groomer and had clients in Riverton, Illinois; she also performed in a band at a tavern in Riverton. Starting in the summer of 2011, Mrs. Hardin regularly drove by the Adams Address. She noticed the Debtor's truck parked at Mr. Fanale's house almost daily, at times ranging from early morning to late evening. She also frequently took photographs of the Debtor's truck parked at the Adams Address. Mrs. Hardin also saw the Debtor parking in Mr. Fanale's garage at that address. In around December 2011, she stopped seeing the Debtor's truck parked at the Adams Address.

Mr. Fanale testified only briefly. He testified that he purchased the house and began living at the Kickapoo Address in December 2011. He formerly lived at the Adams Address, which was owned by his grandmother and then his father. Finally, he testified that he purchased a $3000 diamond ring for the Debtor and gave it to her in the fall of 2011, but that he took it back at one point and gave it back around a year before the trial date. Jenny Alewelt also testified briefly, noting that the Debtor stopped living at the Oakcrest Address in around June 2011.

The parties presented argument at the close of evidence. The matter is ready

–9–

for decision.

## II. Jurisdiction

This court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code, and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011).

## III. Legal Analysis

A discharge under Chapter 13 of the Bankruptcy Code does not discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. §523(a)(2)(A); *see* 11 U.S.C. §1328(a)(2). Some courts interpret "false pretenses, a false representation, or actual fraud" to describe a single type of fraudulent conduct that, akin to common law fraud, requires a false statement upon which a creditor relies to his detriment. E.g. *Husky Int'l Electronics v. Ritz* (*In re Ritz*), 787 F.3d 312, 319 (5th Cir. 2015), *cert. granted,* 136 S. Ct. 445. However, the Seventh Circuit's decision in *McClellan v. Cantrell* distinguishes between false pretenses, a false representation, and actual

fraud, finding that each is a distinct cause of action. *McClellan v. Cantrell*, 217 F.3d 890, 892-93 (7th Cir. 2000).

At the close of trial, Mr. Hardin's attorney argued that the Debtor had made false representations about her cohabitation with Mr. Fanale and for that reason her debt to Mr. Hardin should be excepted from discharge. The Debtor's attorney admitted that the use of the Oakcrest Address long after the Debtor moved may have been a misrepresentation by the Debtor, but he claimed that it was a misrepresentation to the lenders and taxing authorities to whom the documents containing the incorrect address were presented rather than a misrepresentation to Mr. Hardin. Further, he argued that proving reliance on a misrepresentation is a key element in excepting a debt from discharge, and that because Mr. Hardin discovered that the Debtor was misrepresenting the status of her relationship with Mr. Fanale, Mr. Hardin could not have relied on what he knew to be false.

In analyzing the evidence, this Court must follow *McClellan* and consider whether Mr. Hardin has met his burden of proof under any of the three causes of action set forth in §523(a)(2)(A). Because the Debtor's only articulated defense to the allegations against her appears to be the alleged lack of reliance on the part of Mr. Hardin, the issue of whether reliance is always a required element of proof under §523(a)(2)(A) must be resolved.

*McClellan* dealt squarely with the issue of whether reliance is always required to state a claim under §523(a)(2)(A). *Id.* at 892. The *McClellan* court rejected the lower courts' conclusions that the Supreme Court's decision in *Field v. Mans*—which established the "justifiable reliance" standard—requires both a

misrepresentation and reliance in all §523(a)(2)(A) actions. *Id.* (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)). Instead, the court concluded that "by distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation." *Id.* at 893. The court adopted a broader definition of fraud that encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* (quoting 4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)).

The *McClellan* court also said:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*Id.* (quoting *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla.1952)).

*McClellan* held that "reliance is relevant only when a fraud takes the form of a misrepresentation. And that, as we have emphasized, is not the only form that fraud can take or the only form that makes a debt nondischargeable, given that debts created by misrepresentations constitute a separate category of nondischargeable debts." *Id.* at 894.

Courts have subsequently synthesized the holding of *McClellan* into a three-part test for actual fraud. "In order to establish a claim based on 'actual fraud,' a creditor must prove that: (1) 'actual fraud' occurred; (2) the debtor intended to defraud the creditor; and (3) the debtor's actual fraud created the debt at issue."

*Zamora v. Jacobs* (*In re Jacobs*), 448 B.R. 453, 471-72 (Bankr. N.D. Ill. 2011)
(citing *Bletnitsky v. Jairath* (*In re Jairath*), 259 B.R. 308, 314 (Bankr. N.D. Ill.
2001)). The first element requires a showing of some sort of fraudulent conduct
achieved by deceit, trick, or similar, as described in *McClellan*. *Id.* But to satisfy
this requirement, there must be "an element of unfairness" to the transaction.
*Jairath*, 259 B.R. at 317.

The second element, fraudulent intent, requires a showing of *scienter* and
the focus of the inquiry is a debtor's state of mind at the time of the fraudulent
conduct. "Accordingly, subsequent representations or acts do not establish that
the debtor had the requisite intent at the time the representation was made or the
act was carried out. However, courts may consider subsequent conduct to the
extent that such conduct provides an indication of the debtor's state of mind at
the time of the actionable representations or acts." *Jacobs*, 448 B.R. at 472
(citations omitted). Further, the court can infer fraudulent intent "if the totality of
the circumstances suggests that the debtor intended to cheat or otherwise deceive
the creditor." *Id.* (citing *Baermann v. Ryan* (*In re Ryan*), 408 B.R. 143, 157 (Bankr.
N.D. Ill. 2009)). The third and final element is simply that the fraudulent conduct
gave rise to the debt. *McClellan*, 217 F.3d at 895. A causal connection between the
fraud and the debt must be shown.

Under the *McClellan* test, Mr. Hardin has met his burden of proof that the
Debtor committed actual fraud and that her debt to Mr. Hardin should be
excepted from her anticipated discharge. The Debtor's actual fraud included filing
a false affidavit with the state court and presenting false testimony in the state

-13-

court proceedings. She created a false paper trail by using the Oakcrest Address on documents long after she moved from her brother's home. She lied to the state court about the nature of her relationship with Mr. Fanale and where she resided during relevant time periods. All of this was done to circumvent the terms of her Judgment of Dissolution and to cheat Mr. Hardin by requiring him to continue to pay her maintenance when she was no longer legally entitled to receive it. Her conduct included much more than just the "element of unfairness" required to establish actual fraud. Her conduct was wholly unfair, intentionally deceitful, and clearly fraudulent.

There is no doubt that the Debtor's conduct was intended to defraud Mr. Hardin. The Debtor admitted that she was aware that her maintenance would be terminated if she were found to be cohabitating with Mr. Fanale. Her use of several ruses such as the apartment at the Dirksen Address and the post office box in Williamsville were specifically devised to hide the true facts of her residency and prolong the litigation in state court. Likewise, her continued use of the Oakcrest Address was intended to deceive Mr. Hardin and the state court. The Debtor's attorney's suggestion that the fraudulent use of the Oakcrest Address was directed at the Internal Revenue Service or the lenders to whom she made loan applications is disingenuous. The Debtor presented no compelling reason why she would lie to such entities about her address; the only explanation is that she wanted to hide her true place of residence so that she could defraud Mr. Hardin.

Finally, it is clear that the debt for maintenance reimbursement owed by the

Debtor to Mr. Hardin was incurred by the Debtor's fraudulent conduct. The reimbursement judgment is for the maintenance the Debtor received after she was ineligible to continue to receive maintenance and while she was denying the true nature of her relationship with Mr. Fanale. The Debtor's attorney suggested that she was the innocent victim of the long, slow process of moving a matter through the state court. He suggested that if the state court had heard the matter sooner and issued a decision more quickly after the evidentiary hearing, such a large debt for reimbursement would not have accrued. But his argument is again disingenuous. The Debtor could have honestly admitted the truth about her relationship with Mr. Fanale and the fact that she resided with him. She could have stopped the maintenance payments by agreement at any time. Instead she exploited the delays involved in the contested litigation and continued to collect the maintenance payments even though she knew she was not entitled to them.

Mr. Hardin has met his burden of proof to establish actual fraud on the part of the Debtor. Because actual fraud requires no reliance by the victim of the fraud, the Debtor's claim that Mr. Hardin could not have relied on her misrepresentations because he knew they were false provides her with no defense.

### IV. Conclusion

The Debtor engaged in deliberate conduct to defraud Mr. Hardin by requiring him to continue to make maintenance payments to her when she was no longer eligible to receive them. She blatantly lied to the state court about her relationship with Mr. Fanale and her residency during the relevant periods of time. By doing so, she obtained $42,953.86 in maintenance payments she was not

entitled to and she committed actual fraud. The debt from the Debtor to Mr. Hardin for maintenance reimbursement will be excepted from any discharge the Debtor receives in this case.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###